J-A19026-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.L. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3189 EDA 2022 |

Appeal from the Order Entered November 21, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002155-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: L.Y.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.Y.L. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3190 EDA 2022 |

Appeal from the Order Entered November 21, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000333-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: C.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.L. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3191 EDA 2022 |

Appeal from the Order Entered November 21, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002167-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: C.Y.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-A19026-23

APPEAL OF: C.Y.L.

        :
        :
        :
        :
        :
        :
        :
        :  No. 3192 EDA 2022

Appeal from the Order Entered November 21, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000334-2022

BEFORE:  BOWES, J., STABILE, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:  **FILED OCTOBER 16, 2023**

These consolidated appeals arise from orders of the Court of Common Pleas of Philadelphia County (trial court) denying petitions for a goal change and the involuntary termination of parental rights as to the minor children, L.L. (age 5) and C.L. (age 7).[1]  The Department of Human Services (DHS) filed the petitions following several years of permanency hearings dating back to orders of protective custody for both children entered in 2018, removing the children from the care of their parents, S.S. (Mother) and T.L. (Father). Because the evidence adduced at the goal change and termination hearing established all factors necessary for a goal change to adoption and the involuntary termination of Mother and Father's parental rights, we find that

---

* Retired Senior Judge assigned to the Superior Court.

[1] In the record, the younger of the two children is referred to alternatively as "L.L." or "L.Y.L," and the older child is referred to as either "C.L." or "C.Y.L."

- 2 -

the trial court abused its discretion in denying DHS's petitions and vacate its orders.

## I.

On May 7, 2018, DHS received a General Protective Services (GPS) report which alleged that Mother had given birth to L.L. earlier that month, and that Mother might not be able to properly care for the child due to her ongoing difficulty in raising her five other children, who ranged in age from one to seven years old. It was noted that Mother appeared to be very thin and possibly malnourished, and that Mother appeared to be avoiding contact with DHS.

In response to the GPS report, on May 15, 2018, a DHS caseworker met with Mother at her home. Mother told the caseworker that she was attending both to her own medical needs and those of the infant. On June 25, 2018, during a home visit, Father was hostile toward a DHS caseworker, using profanity to declare that his children would not be taken from him.[2]

A month later, Mother informed DHS that she had recently moved with her children to a more affordable hotel. Two weeks later, Mother and Father received their single case plan objectives from DHS. Mother's objectives included (1) cooperating with Community Umbrella Agency (CUA) services and

---

[2] Father is the biological parent of L.L. and C.L., but not of Mother's four other children.

making herself available for visits; (2) actively searching for stable housing; (3) obtaining employment to meet the family's financial needs; (4) completing a dual assessment, drug screenings and releases to be provided to CUA; (5) scheduling and attending routine medical and dental appointments for the children; and (6) attending a mental health therapy program at the Wedge Recovery Center (Wedge). Father's single case plan objectives only required him to make his whereabouts known to CUA and participate in CUA services.

On September 12, 2018, DHS received another GPS report which alleged that the family was evicted from the hotel at which they were staying. Police responded to yet another hotel not long after due to a report of a domestic altercation, and the family was again evicted. Further, the report indicated that Mother and one of her children were cognitively impaired, and that one of her children had been truant from school.

DHS obtained an order of protective custody (OPC) on September 20, 2018, as to L.L., who was at that time being cared for by his paternal great-grandmother. An OPC was obtained the next day for C.L., who was by then in the care of her paternal grandmother. The OPC's as to both children were soon lifted and they were temporarily committed to DHS.

On December 4, 2018, the trial court held a hearing, at the end of which both L.L. and C.L. were adjudicated dependent due to their parents' inability to care for them. The children were ordered to be placed in foster care and they have remained with their respective caregivers since that time.

The trial court also directed Mother and Father to undergo a parenting capacity evaluation. The children's permanency goals were identified as reunification with their parents and regularly permanency review hearings were held before the trial court to track Mother and Father's progress. Years later, on May 18, 2022, DHS petitioned for a goal change to adoption, as well as an involuntary termination of Mother and Father's parental rights as to both L.L. and C.L. The trial court held a hearing on the petitions on November 21, 2022.

At the hearing, Mother testified that she had not attended any of the children's medical appointments since they have been put in placement because she was not notified where and when they were scheduled. Mother stated that the last medical appointment she attended for C.L. was when she was four years old and for L.L. when he was an infant.

Mother admitted that she is unemployed and that she receives Supplemental Security Income (SSI) due to diagnosed cognitive disabilities. She testified that CUA had referred her for intellectual disability services (IDS), but that she was ineligible for IDS because she had not been diagnosed with the requisite disabilities prior to her 22nd birthday.

Mother reported that she has a fear of enclosed spaces and traveling alone in certain neighborhoods. She also disclosed that she has trouble with her memory, concentration and language comprehension. However, she attributed some improvement in those areas to therapy she received in the

Wedge program, which Mother had completed on May 6, 2022. Mother claimed that she had also enrolled in a GED program, and that she had only been prescribed medication for depression.

Mother testified that her best friend taught her how to cook and she is now able to prepare meals. Mother also testified that she does her own laundry and that a friend would take her to the laundromat. Mother stated that she has been managing her own finances for two years, but prior to that her mother managed them. Significantly, Mother admitted that she does not have a strong support system from either her family or friends.

Mother testified that if she were reunified with her children, she would attend to their medical needs and make sure they are well taken care of. Mother stated that they would go to school and enjoy a loving home environment. She testified that she could provide stable housing and that she currently resides in a two-bedroom apartment which has sufficient space for L.L. and C.L., but not enough for all six of her children.

As to supervised visits with the children, Mother testified that she sees them every week for about two hours. However, she only sees C.L. twice a month due to the child's class schedule, and when she does see C.L., it is only for a half-hour. Mother denied coaching C.L. to state that she wants to live with Mother; she also denied showing the child pictures of residences that she does not live in. Mother stated that C.L. calls her "Mom."

The CUA case manager assigned to the present case, Galen Brunson, testified about her experience working with Mother, Father and their children for the past three years. Brunson stated that he interacts with Mother every week during her visits with the children, and that he speaks with Mother and monitors the visits. Brunson confirmed that Mother had completed a program for parenting, housing and employment; she had also attended Wedge for individual therapy.

As to Mother's cognitive impairment, Brunson testified that Mother' IQ is 54 and that a referral was made for Mother to receive IDS. To qualify for those services, Mother needed to show documentation of certain diagnoses prior to her 22nd birthday, and such documentation could not be obtained, rendering Mother ineligible. Brunson stated that he did not make any additional referrals because he understood that the IDS program was the only service that would meet Mother's needs.

Brunson raised several concerns regarding Mother's interactions with the children, as well as her ability to care for them. He testified that during visits, Mother feeds the children and talks to them but often sits apart from them at a table and watches them play from a distance. CUA, which facilitated the children's medical appointments, had not relayed to Brunson that Mother had ever attended one. Mother also appeared to have trouble grasping basic matters concerning her children. Brunson recalled that on at least five occasions, Mother has shown pictures of different houses to her children,

indicating that the entire family would soon be relocating to those residences when, in fact, it was not a possibility. A report received by Brunson indicated that Mother had instructed the children to "misbehave for their current caregivers." Permanency Hearing Transcript, 11/21/2022, at p. 117.

As to Mother's relationship with C.L., it was Brunson's opinion that there exists no parental bond. Since 2018, when C.L. was an infant, the child has been in the care of her paternal grandmother, whom the child calls "Mama." Conversely, C.L. calls Mother by her first name. Brunson testified that the child looks to her paternal grandmother to meet her medical, educational and emotional needs, and that the child has a strong parental bond with her. Either due to her disability or lack of involvement, Mother did not know which school C.L. attends.

As to L.L., Brunson testified that the child is currently placed with her paternal great-grandmother, whom he had been with for about three years. Brunson stated that L.L. has a healthy parental bond with his caretaker and that he calls her "Mama." He testified that L.L. also calls Mother by her first name.

Brunson testified that L.L.'s caretaker meets his everyday needs. As with C.L., Brunson believed that L.L. did not have a parental bond with Mother. Brunson emphasized that the child did not always want to stay for the entirety of his visits with Mother, instead preferring to go home early with his caretaker.

Due to their relationships with their current caretakers and the lack of a parental bond with Mother, Brunson did not believe that the children would suffer irreparable harm if Mother's parental rights were terminated. Brunson opined that it is in the best interest of the children to have their goal changed to adoption because they do not have a parental bond with Mother. Indeed, Brunson stressed that it would be detrimental to remove the children from their homes with their current caregivers, both of whom are pre-adoption resources who are willing to adopt the respective child in their care.

Brunson also did not believe that Mother had progressed enough in her plan objections to warrant reunification with the children. As evidence of this, Brunson noted that Mother has failed to find stable housing, and that Mother had not been able to avail herself of IDS services or otherwise overcome her cognitive impairments.

As to Father, Brunson testified that he has been mainly absent from the children's lives for several years. The single case plan objectives were limited to making his whereabouts known and to have supervised visits with children at CUA's premises. Brunson stated that no additional single case plan objectives were implemented because Father had been so uncooperative with CUA that it would have been futile.

Brunson stated that he personally saw Father once on May 3, 2020, and that since that time, Father has not contacted CUA about the children or sought to arrange supervised visits with them. Nor has Father provided any

other care or support for the children. As of the date of the subject hearing, which Father did not attend, his whereabouts were unknown, and he had made no progress toward alleviating the circumstances that caused the children to be removed from his care.

Dr. William Russell, a psychologist, testified at the hearing as an expert on parenting capacity evaluations and his testimony echoed that of Brunson in many respects. Dr. Russell testified that he evaluated Mother's parenting capacity in person on March 17, 2020, and July 13, 2020. These evaluations took over two hours to complete.

One main area of concern for Dr. Russell was the unstable housing situation Mother faced, beginning in 2017 when Mother and her children were evicted. It was not until early 2022 that Mother's housing had improved due to her signing a lease for a two-bedroom apartment.

Dr. Russell's other main area of concern – Mother's ability to take care of her children on a daily basis – had not been resolved as of the date of the permanency hearing. Despite Mother's assurances that the children would be well cared for under her supervision, Dr. Russell noted "neglect, medical neglect, truancy, and other issues that the children faced" prior to their placement. Permanency Hearing Transcript, 11/21/2022, at p. 71.

Dr. Russell further stated that Mother had failed to demonstrate an ability to maintain a safe environment for the children on her own, and that even without the children, she required constant help just to "engage in the

activities of daily living." ***Id***. at p. 74. Mother's cognitive impairment would make it unlikely that she would be able to shoulder full parental responsibility for L.L. and C.L., much less all six of her children:

> That she openly states that she has difficulty traveling outside of her immediate[] environment is another concern, because children will have medical appointments, dental appointments, school activities, social activities, all the extracurricular activities, plus any meetings you have to go somewhere to attend something with. So there are quite a few concerns in terms of her ability just to meet these two children's needs.

***Id***. at p. 76.

Additionally, as discussed by Dr. Russell, Mother had failed to obtain steady employment, and her monthly SSI disability payment of $750 was the same amount as her current monthly rent. The lack of income would make it difficult for Mother to pay for the necessities of life for her and the two children. Dr. Russell also agreed with Brunson that it would be "traumatic" to remove the children from the homes that they have been in for most of their lives.

Although Mother faced considerable challenges, Dr. Russell testified that there is a chance that Mother would have been more able to meet the children's needs if she had been assigned a personal intensive case manager. On that point, the trial court had Dr. Russell clarify the amount and type of help Mother would need to be a successful parent of the children:

> **Trial court**: I have one question. As I listen to your testimony, what stands out the most, aside from your last statement that given the opportunity [Mother] might have been able to meet these challenges; was that – you're saying I believe, and correct me if I'm wrong.

- 11 -

The biggest obstacle of [Mother] being able to parent her children is having someone – some support in the home with her. You said she was able to meet all the goals, everything, when her brother was there. But once that in home support left, that's when she sunk.

. . . .

**Dr. Russell**: Absent that support, I don't believe she's able to provide a safe environment. . . . It would depend on her willingness and ability to do that. Clearly there are cognitive delays. Clearly there is a history and a presentation that reflects those cognitive delays.

So it's hard to say how much she'd be able to take. I think that she would need an extended period of someone with her, so that she could take it in and practice it, and then be allowed an opportunity to demonstrate the internalization of that. So it's a rather lengthy process. And the success of it, if it were to succeed at all, would be a long time process where it would be up to her.

*Id*. at pp. 82-83.

Dr. Russell did not discuss how an intensive case manager is assigned or whether one would be available to Mother. However, Brunson had indicated that he had already requested an intensive case manager for Mother from Community Behavioral Health, but the agency did not provide the service to Mother at that time. *See id*. at p. 117.

The final witness at the permanency hearing was C.L.'s guardian *ad litem*, Karen Williams, Esq., who provided the trial court with a report from her meeting with C.L. She corroborated earlier testimony that the child called her current caregiver "Mom" when asked who takes care of her. Despite C.L. telling Williams that she wanted to live "in [S's] house," the child also whispered to Williams that she is supposed to refer to Mother as "Mom" and

not by her first name. This gave Williams the impression that C.L. would not be capable of reliably articulating where she would like to live because it appeared that she is susceptible to coaching and it "was clear she was told to call [S][,] Mom" in the presence of others. *Id*. at p. 91.

At the conclusion of the November 21, 2022 goal change and termination hearing, the trial court denied the petitions for a goal change and the termination of Mother's and Father's parental rights. Counsel for each child then timely appealed and submitted 1925(b) statements.

The trial court issued a single 1925(a) opinion giving its reasons for denying the goal change and termination petitions:

> Specifically, although Children have been in care since 2018, the conditions that led to the Children's removal do not continue to exist, Mother is fully compliant with her permanency plan objectives and the only remaining concern is for Mother's intellectual disability. Mother has completed ARC for parenting, housing and employment and was successfully discharged from the Wedge for individual therapy. Due to Mother's intellectual disability, she is not currently employed but she receives social security income monthly. Mother has stable housing for Children and has been able to maintain her residence since the beginning of 2022.
>
> Furthermore, Mother testified that the programs she went to helped improve some of her cognitive disabilities and that she was enrolled in a GED program. Mother has also learned how to be more self-sufficient and care for herself without any services. Mother testified that she learned how to cook and has been managing her finances on her own for two years. Mother also testified that she would be willing and able to take Children to their medical appointments and ensure that they are in school.
>
> Furthermore, this Court was not persuaded by Galen Brunson's testimony as to Mother being minimally compliant with her progression towards alleviating the circumstances that caused

- 13 -

Children to come into care. Mr. Brunson's rating of Mother's progression is based on her housing and lack of services for her intellectual disability. It was established that Mother has stable housing for Children. Mr. Brunson failed to refer Mother to any other services that would support her low IQ or learning disability. CUA failed to look into any other services for Mother because Mr. Brunson was under the impression that only one service would meet Mother's needs. Mr. Brunson lacks the knowledge to determine what services would be appropriate for Mother. Instead, this Court gave more weight to the testimony of Dr. Russell who completed the parenting capacity evaluation on Mother. Dr. Russell testified about different concerns he had towards Mother being able to parent her children with the biggest obstacle being Mother's lack of in home support.

He testified that Mother would have had an opportunity to be more successful if she had been provided with services to address her learning disability. He stated that he believes Mother needs an extended period of someone with her so that she can take in the teachings, practice them, and then be allowed an opportunity to demonstrate the internalization of what she learned. Additionally, Mr. Brunson testified that an intensive case manager would have been able to spend more time with Mother if recommended.

Therefore, Mother should not be penalized for failing to rid herself of an intellectual disability especially since DHS/CUA failed to provide reasonable efforts in . . . finding additional supports for Mother's disability.

Trial Court 1925(a) Opinion, 4/4/2023, at 16-17 (record citations omitted).[3]

Counsel for the children submitted a single brief raising several issues on appeal, as the relevant facts and legal issues are identical as to each child's case. The overarching claim is that the trial court erred in ignoring the clear

_____

[3] The trial court filed a single 1925(a) opinion as to the appeals concerning both children, as the relevant facts and legal issues were identical in both of their respective cases. No brief was filed in support of affirmance of the orders on review.

and convincing evidence supporting the need for a goal change and the involuntary termination of Mother and Father's parental rights. It is further asserted that the trial court considered irrelevant factors when determining that the evidence did not support termination.

## II.

We first address the claim that the trial court abused its discretion in denying DHS's petitions to involuntarily terminate Father's parental rights as to the minor children, L.L. and C.L. We find that this claim has merit.

DHS petitioned to terminate Father's parental rights under 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). It was not disputed that Father failed to comply with or make progress on his permanency plan for the reunification with the children. He did not attend the hearing on DHS's petitions for termination of parental rights and a goal change, and his whereabouts were unknown at the time of the hearing.

Father did not regularly visit the children once they were put into foster care in 2018, and there is no record evidence that Father established a parental bond with the children in the past five years. Nevertheless, the trial court denied the petitions for involuntary termination as to Father, finding that to do so would be "punitive." Trial Court 1925(a) Opinion, 4/4/2023, at 18. The trial court did not elaborate on this finding, but it appears that it was predicated solely on the fact that Mother's parental rights were not terminated. *See* Permanency Hearing Transcript, 11/21/2022, at p. 102.

- 15 -

The Adoption Act requires the trial court to consider the grounds enumerated in 23 Pa.C.S. § 2511 when ruling on a petition to involuntarily terminate parental rights. Where a trial court's ruling on such a petition is not supported by competent record evidence, it constitutes an abuse of discretion. **See In re C.W.U., Jr.**, 33 A.3d 1, 9 (Pa. Super. 2011) (holding that trial court abused its discretion when it did not terminate the father's rights solely because the mother's rights were not terminated, explaining that each parent must be assessed separately).[4]

Here, the trial court did not make *any* factual findings with respect to Father, and our review of the record yields no evidence that would support the denial of the petitions for involuntary termination. To the contrary, several grounds for termination of Father's parental rights were indisputably proven by clear and convincing evidence. **See generally** 23 Pa.C.S. § 2511(a)-(b).

The only basis for denial of the petitions suggested by the trial court, **see** Trial Court 1925(a) Opinion, 4/4/2023, at 18, was legally insufficient. **See In re C.W.U., Jr.**, 33 A.3d at 9; **see also In re Burns**, 379 A.2d 535,

_____

[4] The trial court, which sits as the finder of fact, resolves any conflict as to the weight of the evidence, conflicts in the evidence, and the credibility of witnesses. **See In re Adoption of A.C.H.**, 803 A.2d 224, 228 (Pa. Super. 2002). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. . . . We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." **In re B.L.W.**, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*) (internal citations omitted).

541 (Pa. 1977) ("Nothing in the Adoption Act requires that an agency, which has assumed custody of a child, must establish grounds for the involuntary termination of both parents, before it can obtain such a decree as to either."). Thus, to remedy the trial court's abuse of discretion, we vacate the orders denying DHS's petitions to involuntarily terminate Father's parental rights as to L.L. and C.L.

## III.

### A.

We now turn to the trial court's rulings with respect to the petitions for the involuntary termination of Mother's parental rights.

The trial court must apply a two-part test when considering such a petition. *See* 23 Pa.C.S. § 2511. The first part concerns the conduct of the parent under the grounds enumerated in Section 2511(a), which must be proven by clear and convincing evidence. *See id*.; *see also In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010).[5] Each of those enumerated grounds must be evaluated as written, and courts should not employ a "balancing" or "best interest" approach when evaluating any one factor. *In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

---

[5] "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-04 (Pa. 1989).

The second part of the test set forth in Section 2511 concerns the "developmental, physical and emotional needs and welfare of the child." *See* 23 Pa.C.S. § 2511(b). Relevant considerations in this analysis include whether there exists a parental bond between the child and parent, as well as the effect that permanently severing the bond may have on the child. *See id*. Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, and termination is in the child's best interests under Section 2511(b). *See B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Neither of the two parts of the test require consideration of whether a government agency made reasonable efforts in assisting a parent to remedy the conditions that led to the child's placement, such as a parent's lack of capacity to provide care. *See In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014). Denying termination for that reason would only "punish an innocent child" rather than promote the child's best interests. *Id*.

In the present case, DHS appeals the trial court's denial of termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8) and (b). These statutory provisions read as follows:

> (a) General rule. The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), the court shall not consider any efforts by the parents to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.[6]

Each these provisions will be evaluated in turn below, beginning with subsection 2511(a)(2).

**B.**

In its 1925(a) opinion giving the reasons why termination was denied under subsection 2511(a)(2), the trial court relied primarily on the testimony of Dr. Russell, who opined that Mother would possibly be able to care for the children if given an "extended" or "lengthy" process" in which she could learn the necessary skills. Permanency Hearing Transcript, 11/21/2022, at pp. 83-84. Dr. Russell specified that the possibility of Mother gaining capacity to meet the children's needs would also depend on around-the-clock in-home assistance from an intensive case manager. *See id*. The trial court construed this testimony as evidence that Mother will be able to gain the capacity to care for the children in a "reasonable additional time." Trial Court 1925(a) Opinion, 4/4/2023, at 18.

However, the evidence adduced at the hearing did not warrant the denial of termination under subsection 2511(a)(2), and the trial court ignored uncontroverted evidence that Mother's inability to care for the children will not soon be remedied. Crucially, Mother's housing and employment situations are

---

[6] While DHS's petitions for termination cited subsection 2511(a)(1), review is not sought in these appeals as to the trial court's denial of termination pursuant to that specific ground.

*not* stable, and currently Mother lacks the capacity and resources to remedy those circumstances. The record established that Mother has not been employed for the past several years. She receives $750 a month in intellectual disability benefits, which is the same amount due for her monthly rent. It remains unknown how Mother's lack of income would make it financially feasible for her to satisfy the needs of L.L. and C.L. Mother admitted that her current two-bedroom apartment would not offer enough space for all six of her children.

For over four years, the children have been provided for exclusively by their respective caretakers, with whom the children have developed parental bonds. Despite Mother's best efforts, she has not demonstrated that she would be able to resume parental duties either now or in the near future. *See In re K.H.B.*, 107 A.3d 175, 183 (Pa. Super. 2014) ("This Court will not prolong instability for Child when it is clear that Mother and Father will be unable to provide for Child's basic needs in the near future."); *In re Z.P.*, 994 A.2d at 1126 ("Z.P. has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little rational prospect of timely reunification.").

Moreover, the trial court improperly focused on the supposed failure of CUA and DHS to procure additional assistance to Mother (an intensive case manager and IDS), which is beyond the scope of Section 2511(a)(2). Our Supreme Court has explained that this provision is limited to a parent's

*present* capacity to provide care to a child; a termination petition may establish the requirements of Section 2511(a)(2) without demonstrating an agency's reasonable efforts to remedy a parent's incapacity. **See In re D.C.D.**, 105 A.3d at 672-73 (explaining that a trial court may consider the availability of additional services to a parent when considering termination under subsection 2511(a)(5) but not under subsection 2511(a)(2)).

Accordingly, the trial court abused its discretion in denying DHS's petitions to terminate Mother's parental rights as to the two children pursuant to Section 2511(a)(2).

## C.

Next, we consider whether the trial court abused its discretion in denying the termination of Mother's parental rights under subsection 2511(a)(5).

Parental rights may be terminated under this subsection where (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the removal and placement of the child continue to exist; (3) the parent cannot remedy those conditions within a reasonable period of time; (4) the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. **See** 23 Pa.C.S. § 2511(a)(5); **see also In re Z.P.**, 994 A.2d at 1118.

The first factor is clearly met as the children have been in foster care for more than four-and-one-half years (almost ten times longer than the six-month requirement). The second and third factors are met because, as discussed above, the conditions which led to the children's removal continue to exist and, contrary to the trial court's conclusion, there is no evidence in the record supporting a finding that they will be remedied by Mother within a "reasonable time."

Unlike subsection 2511(a)(2), the fourth factor under subsection 2511(a)(5) requires a consideration of the services reasonably available to the parent. *See In re D.C.D.*, 105 A.3d at 673. To deny termination under this factor, the evidence must show that those services are likely to remedy the conditions which led to placement "within a reasonable period of time." 23 Pa.C.S. § 2511(a)(5).

The record does not support the trial court's conclusion that additional services "are reasonably available" to Mother, or that they would remedy Mother's circumstances within the period outlined in subsection 2511(a)(5). The testimony of Dr. Russell confirms just the opposite.[7] While Dr. Russell mentioned the possibility that Mother may have benefited from an intensive

_____

[7] Brunson had testified that he requested an intensive case manager from Community Behavioral Health in Philadelphia, the only organization Brunson knew of which could provide that resource, and an intensive case manager was not available. *See* Permanency Hearing Transcript, 11/21/2022, at pp. 116-18.

case supervisor in the past, he only described the prospective utility of this service as a "lengthy process . . . if it were to succeed at all[.]" Permanency Hearing Transcript, 11/22/2022, at pp. 83-84.

The final factor under subsection 2511(a)(5) requires the trial court to consider whether termination of parental rights would serve the best interests of L.L. and C.L., including the children' bonds with their pre-adoptive parents.[8] The evidence of a strong paternal bond between Mother and the children was scant, at best. On the other hand, both Brunson and Dr. Russell testified that it would be "traumatic" for the children to be removed from the care of their current foster parents with whom the children have parental bonds.

In sum, there is clear and convincing evidence that termination was warranted under subsection 2511(a)(5), and the trial court abused its discretion in denying DHS's petitions for termination on this ground as to both children.

### D.

The last ground for termination that we address is stated in subsection 2511(a)(8), which requires clear and convincing evidence of the following elements: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions that led to the removal or placement of the

---

[8] This ground for termination overlaps with the test for Section 2511(b), which likewise focuses on the best interests of the child.

child continue to exist; and (3) termination of parental rights would best serve the needs of the child. *See* 23 Pa.C.S. § 2511(a)(8); *see also In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009).

For the purposes of this subsection, it is not relevant whether a parent is able or willing to remedy the conditions leading to the removal within a reasonable time. Nor is it relevant whether agency services would be availing to the parent in the future. Termination may be denied under subsection 2511(a)(8) if all conditions necessitating removal have been remedied and reunification is "imminent at the time of hearing." *In re I.J.*, 972 A.2d at 11.

Of relevance to the present cases, termination under this subsection may also be proper even where a parent has demonstrated some progress toward remedying the circumstances which caused a child's removal:

> We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance . . . This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to complete the process of either reunification or adoption for a child[.]

*Id*. at 11-12.

Here, the record establishes that all factors outlined in subsection 2511(a)(8) were proven by clear and convincing evidence. More than four-and-one-half years have elapsed since L.L. and C.L. were adjudicated

dependent, and the trial court implicitly acknowledged that the conditions necessitating that adjudication still exist. This is evidenced in part by the trial court's permanency review orders and 1925(a) opinion, which include no finding that reunification was "imminent" at the time of termination and goal change hearings. It is notable that the trial court also continued to require that Mother be supervised during her visits with the children, and the trial court also stressed that Mother may benefit in the future from an intensive case manager. **See** Permanency Hearing Transcript, 11/22/2022, at p. 118.

The trial court suggested that Mother had made progress in mastering parental and general life skills, and that she might be able to improve further with "reasonable additional time and appropriate services," but this potential progress is irrelevant under the standard of termination in subsection 2511(a)(8). **See In re I.J.**, 972 A.2d at 11 (reversing denial of termination pursuant to this subsection because the trial court improperly considered parent's progress toward their goals).

In support of its ruling, the trial court cited just one case, **Interest of S.K.L.R.**, 256 A.3d 1108 (Pa. 2021), which is materially distinguishable. In **S.K.L.R.**, our Supreme Court reviewed termination rulings as to two children who had been in placement for about two years. The mother had completed anger management classes, improved her conduct toward the children and obtained stable housing and employment. Agency workers testified that they "never witnessed [the mother] do anything that concerned [them] with

- 26 -

respect to the children" and that she continued making progress, establishing a strong parental bond. *Id*. at 1114-15.

The trial court in *S.K.L.R.* gave much weight to the fact that the mother had cared for her youngest daughter for the past one-and-one-half years since she was born, which was the majority of the time that her older children had been placed in care. *Id*. at 1118. The trial court emphasized that "the Agency caseworker stated unequivocally that they have no concerns for this child." *Id*. The trial court then noted that the mother's only failure was her absence from mental health therapy sessions due to conflicts with her work schedule.

These circumstances prompted the trial court to find that the mother would be able to remedy the need for mental health services "with a few more months of steady progress." *Id*. Termination was therefore denied because "none of the conditions that led to the removal and placement of the children continue to exist." *Id*.

On appeal, this Court reversed the trial court's ruling, holding that the conditions leading to removal still existed because the mother had failed to fully address her mental health needs. We found that it was both speculative and irrelevant under subsection 2511(a)(8) whether it could be anticipated that those conditions would be remedied at some point in the future.

Our Supreme Court vacated the latter decision, concluding that this Court had exceeded its scope of review because it did not limit its analysis to determining whether the trial court's findings of fact were supported by the

record. The Supreme Court also took issue with the agency's decision to reduce the mother's contact with her children during their placement, which diminished the chances of reunification.

Here, though, unlike in **S.K.L.R.**, there is no evidence that Mother is able to care for the children over a prolonged period of time, that there a parental bond with the children, or that Mother has remedied the circumstances leading to the removal of the children from her care. The record shows, rather, that Mother's incapacity continues to prevent her from being able to provide the children a safe environment and satisfy all of their other needs. After over four-and-one-half years, it remains speculative whether Mother will ever be able to overcome her cognitive disabilities enough to care for two small children, even if given in-home assistance.

This undefined timeline is critical because the children have already been in care for over four years, which is the majority of their young lives. Yet, Mother remains unemployed, reliant on SSI benefits and unsupported by a strong network of family and friends. Moreover, unlike in **S.K.L.R.**, there are ongoing concerns regarding Mother's interactions with the children, which, tellingly, prompted the trial court to continue requiring her visits with the children to be supervised.[9]

---

[9] Unlike in **S.K.L.R.**, there is no evidence that DHS stopped assisting Mother or ever impeded her progress. Regardless, subsection 2511(a)(8) only
*(Footnote Continued Next Page)*

The trial court also seemed to rely on the testimony of Dr. Russell to find that Mother could attain the necessary skills to care for the children, but Dr. Russell's testimony was not nearly as conclusive as the trial court suggests in its 1925(a) opinion. Again, Dr. Russell merely speculated that it is *possible* that Mother could have become adept at necessary parenting skills if she had been supervised for an indefinite period by an intensive case manager. However, the only fair implication of that testimony is that currently Mother does not have those skills, and it is entirely speculative whether additional resources would be available or availing to the extent needed to warrant reunification.

Accordingly, the record contains clear and convincing evidence supporting termination under subsection 2511(a)(8), and the trial court abused its discretion by discounting uncontroverted evidence that Mother has failed to remedy the conditions that led to the children's placement in foster care.

**E.**

Turning to Section 2511(b), we again find – for reasons similar to those discussed above – that the trial court abused its discretion in denying the termination of Mother's parental rights.

concerns whether the conditions leading to children's removal have been remedied. *See In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009).

Once any of the grounds in Section 2511(a) are met, the trial court must rule on whether termination is warranted under Section 2511(b) by evaluating the child's best interests.[10] This determination requires consideration of the child's emotional bond with her natural parents and caretakers.

"This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated." *In re K.H.B.*, 107 A.3d at 180 (quoting *In re K.Z.S.*, 946 A2d 753, 764 (Pa. Super. 2008)). Courts must consider whether the child has a parental bond with a foster parent and whether they are currently in a pre-adoptive home. *See In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (the existence of a pre-adoptive home is "an important factor" in termination cases) (quoting *In re R.I.S.*, 36 A.3d 567, 575 (Pa. 2011) (Saylor, J., concurring)).

In this case, L.L. and C.L. have been in the care of their current foster parents for most of their lives and both foster parents are pre-adoptive resources. C.L. calls her current caretaker "Mom" but calls Mother by her first name, "S". Similarly, L.L. calls his current caretaker "Mama." The children's

---

[10] The trial court did not expressly rule on whether Section 2511(b) was satisfied, as it did not make the requisite finding that any of the grounds in section 2511 had been proven. However, when discussing the propriety of termination under subsections 2511(a)(5) and (a)(8), the trial court stated in its 1925(a) opinion that termination would not be in the children's best interests, making apparent the trial court's view with respect to Section 2511(b). *See* Trial Court 1925(a) Opinion, 4/4/2023, at p. 14.

caretakers have been the sole providers of their medical, educational and emotional needs for over four years. They also have strong parental bonds with caretakers. The children's caretakers are willing to adopt them, maintaining the bonds they have already formed.

No such bond exists with Mother. The children interact little with her during supervised visits, and to the extent that C.L. expressed a desire to live with Mother, there was compelling evidence that the child had been coached by Mother to state that preference. There was also ample evidence that severing the bond between the children and their current caretakers would be detrimental to the children. In fact, Dr. Russell (whose testimony the trial court had credited) believed that it would be "traumatic" to remove the children from their caretakers. Permanency Hearing Transcript, 11/22/2022, at p. 81.

In sum, the record contains clear and convincing evidence that it is in the children's best interests to be permanently placed with their current foster parents, with whom the children have strong parental bonds, satisfying Section 2511(b). The trial court abused its discretion in coming to the opposite conclusion, as that ruling was unsupported by the record.

**IV.**

Finally, we review the trial court's denial of DHS's goal change petitions, applying an abuse of discretion standard. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). In light of our holding above concerning the termination of

Mother and Father's parental rights, the issue of the requested goal change is moot. *See Interest of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021); *see also In re D.K.W.*, 415 A.2d 69, 73 (Pa. 1980).

Even if we had not held that termination is warranted, we would conclude that the trial court abused its discretion in denying DHS's petitions for a goal change from reunification to adoption. When ruling on a petition for a goal change as to a dependent child, the trial court must consider:

> (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotations omitted).

Pennsylvania law "mandate[s] permanency planning such that, 'when a child is placed in foster care, after reasonable efforts have been made to establish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents.'" *See In re R.M.G.*, 997 A.2d 339, 347 (Pa. Super. 2010).

If the child has been in placement for at least 15 of the last 22 months from the date of a permanency hearing, then the court must determine whether the county agency has filed a petition to terminate parental rights and identified a qualified family to adopt the child. *See* 42 Pa.C.S. § 6351(f)(9)(ii)-(iii). The trial court must decline to order a goal change and terminate parental rights if the county agency has documented a compelling reason for determining that terminating parental rights would not serve the needs and welfare of the child or the child's family has not been provided with the necessary services to achieve reunification. *See* 42 Pa.C.S. § 6351(f)(9)(ii)-(iii).

Based on the determinations made under subsection (f) and all relevant evidence presented at a goal change hearing, the trial court must determine the appropriate goal and time frame for achieving the goal pursuant to 42 Pa.C.S. § 6351(f.1). In cases where a return to the child's parent is not best suited to the safety, protection and physical, mental and moral welfare of the child, the court shall determine if and when the child will be placed for adoption, and the county agency must file for the termination of parental rights. *See* 42 Pa.C.S. § 6351(f.1)(2).

In this case, the evidence at the goal change and termination hearing demonstrated that the children have lived with their current caregivers for more than four years and that the children have strong parental bonds with them, with each child referring to their respective caregiver as "Mom" or

"Mama." The current caregivers of the children are both pre-adoptive resources who are willing to adopt each child.

Multiple witnesses testified that Mother does not have a parental bond with the children, and that severing the bond between the children's current caregivers or removing them from their homes would be "traumatic." Regardless, even if Mother had a parental bond with the children, she remains unable to care for them at present. The record does not demonstrate that even around-the-clock live-in support would enable Mother to care for the children or otherwise remedy the circumstances that led to the children's placement in foster care. Nor is it evident anywhere in the record that such services would be available to Mother.

Thus, the record establishes that all the factors necessary for a goal change to adoption have been met, and that such goal changes would be in the children's best interests. For that reason, the trial court abused its discretion in denying DHS's goal change petitions as to each child. *See e.g.,* ***D.C.D.***, 105 A.3d at 675 (explaining that "nothing in the language or purpose of Section 6351(f)(9) forbids the granting of a petition to terminate parental rights under Section 2511 as a consequence of the agency's failure to provide reasonable efforts to a parent.").

Orders vacated.  Case remanded for the entry of orders of involuntary termination of Mother and Father's parental rights.  Jurisdiction relinquished.

Judge Bowes joins the memorandum.

Judge Stabile concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/16/2023